### SLICK et al. v. BOYETT et al.

No. 22192. Opinion Filed Nov. 15, 1932.

H. C. Thurman and Byrne A. Bowman, for petitioners.

Emerson & Carey and Duncan & De-Parade, for respondents.

KORNEGAY, J. This is an action by T. B. Slick and the insurance carrier to review an award of the Industrial Commission that is as follows:

"Now, on this 23rd day of February, 1931, the State Industrial Commission being regularly in session, this cause comes on for consideration, pursuant to hearings had at Oklahoma City, Okla., August 19, August 28, and September 11, 1930, to determine liability and extent of disability, and the claimant appearing in person and by Emerson & Duncan, and the respondent and insurance carrier appeared by J. V. Anderson, said hearings being held before Thos. H. Doyle, Chairman, and the Commission after examining all the records on file, reviewing the testimony taken at said hearings and being otherwise well and sufficiently advised in the premises makes the following findings of fact:

"1. That on the 27th day of May, 1930, the claimant was in the employment of said respondent and engaged in a hazardous occupation subject to and covered by the provisions of the Workmen's Compensation Law, and that on said date said claimant sustained an accidental injury arising out of and in the course of his employment, by receiving a broken ankle.

"2. That the average daily wage at the time of said accidental injury was $4 per day.

"3. That by reason of said accidental injury, the claimant was temporarily totally disabled from the 27th day of May, 1930, up until this time, and is at this time temporarily totally disabled from performing ordinary manual labor.

"4. That claimant has heretofore been paid compensation from May 27, 1930, to June 23, 1930, or for three weeks beyond the five-day waiting period, at the rate of $15.39 per week, or a total of $47.17.

"Upon consideration of the foregoing facts, the Commission is of opinion that the claimant is entitled to 35 weeks' compensation at the rate of $15.39 per week, or the total sum of $538.65, computed from June 23, 1930, to February 21, 1931, and that respondent should continue paying compensation at the rate of $15.39 per week until the further order of the Commission.

"It is therefore ordered, that within 15 days from this date the respondent or insurance carrier pay to the claimant herein the sum of $538.65, or 35 weeks' compensation at the rate of $15.39 per week, and to continue paying the claimant compensation at the rate of $15.39 per week until the further order of this Commission, and to pay all medical, hospital and doctor bills incurred by reason of said accidental injury.

"It is further ordered: That within 30

days from this date, the respondent or its insurance carrier file with the Commission proper receipt or other report evidencing compliance with the terms of this order."

It is claimed by the petitioner that the award is deficient in several particulars, but the only one that it appears to us it is necessary to decide is whether or not the injury complained of in this case is compensable under the Workmen's Compensation Law. The method of procedure in this case is somewhat novel. Evidently baseball was uppermost in the mind of the claimant and of a great many of the employees of the company, for whose accidental injury the insurance policy was taken out under the Workmen's Compensation Law. Some compensation was paid under the mistaken idea that the claimant was a worker instead of a ball player, and that the injury occurred while he was engaged in the line of duty as a worker for a pipe line company, rather than a worker as a baseball player, either professional or amateur, for the purpose of amusing himself and the bystanders and the co-employees. It is very evident that the subordinate employees enjoyed the game, and were willing that the employer should pay for all time that was lost as a result of playing ball, though there was an effort made to claim that enough overtime was worked out to compensate for the lost time while they were engaged in recreation during regular work hours.

The first notice to the employer that appears in the record was received on the 18th of June, 1930, and signed by J. D. Mugg, who claimed that the occupation of the injured party was that of a roustabout, and in describing how the accident occurred, the language is:

"Stepped off of derrick floor and turned his leg."

The next document was received on the 25th of June, 1930, and was a report by the insurance carrier of initial payment of $61.56 from the 2nd of June, 1930, to the 23rd of June, 1930. The next document appears to have been received the 25th day of July, 1930, and was a report of the employee and is signed by the claimant, F. C. Boyett, and the mail address was "care of Emerson & Duncan, Attorneys, 506 Okla. Savings Bldg., Okla. City." The occupation of the claimant there given is baseball player and roustabout, and the cause of accident is "sliding into third base," and the nature and extent of the injury is "broken right ankle."

A notice is given of the hearing on August 1st, and a formal motion for the hearing is stamped as received the 25th of July, which is as follows:

"Comes now the claimant, Floyd C. Boyett, and shows to the Commission as follows:

"1. That the respondent T. B. Slick is, and was at all times hereinafter mentioned, engaged in the production of oil, which is business subject to and covered by the Workmen's Compensation Law of the state of Oklahoma, and that the Century Indemnity Company is and was at all times hereinafter mentioned, the insurance carrier for the said T. B. Slick.

"2. That on or about the 27th day of May, 1930, the claimant was an employee of the said respondent, engaged in said hazardous industry and performing his duties in the oil fields located in Oklahoma county, state of Oklahoma.

"3. That on said day, and in said county and state, the claimant sustained an accidental personal injury, arising out of and in the course of his employment with the respondent.

"4. That the claimant's wages at the time of said accident were $4 per day and that claimant is entitled to compensation at the rate of $15.39 per week.

"5. That the respondent and insurance carrier admitted their liability in this cause and furnished medical attention for the claimant from the 2nd day of June, 1930, to the 23rd day of June, 1930.

"6. That the respondent and insurance carrier have failed and refused to pay further compensation to the claimant and state that they do not intend to pay anything further in this cause; and the suspension of compensation by the respondent and insurance carrier is unlawful and was done with utter disregard of rule No. 17 of the State Industrial Commission.

"7. That the claimant is totally disabled because of said accident and has been since the date of said accident; and that the claimant is advised and believes that he will have a partial permanent disability.

"Wherefore, premises considered, the claimant moves that this cause be set for hearing at Oklahoma City and that he be awarded such compensation as he may be entitled to receive."

The hearing was had on the 19th day of August, both parties being represented by attorney, and the testimony of the claimant was taken to the effect that he was working for T. B. Slick and had been working 20 days, and was hired by Chas. Fletcher, and his immediate foreman was Bill Richardson, and the work he was to do was

"pipe work when he worked." He was interrogated by his attorney as to what kind of work it was and when they quit, and being asked what he was doing when he was hurt, said:

"I was playing baseball and I broke my ankle."

He further testified that all of the bosses knew of it, and that they wrapped his foot in a blanket and the superintendent sent him to the hospital, and he got out on the 5th of June, and was not able to work, and with reference to his salary while playing ball, he testified:

"Yes, sir; the time when I was playing ball just like I would for working."

He was further questioned as to having a uniform with the Slick name; about playing with the I. T. I. O. a game, and one with Jones; and that he received pay for work while he was playing ball, and they practiced every evening, sometimes they began at 3:30 and up to 6 o'clock.

Detailing the method of employment, he claimed that the field superintendent, Chas. Fletcher, had hired him, and that he came by on Wednesday the 7th of May, and he played catch with Bill Richardson, a foreman over one of the gangs, and they informed the superintendent that the claimant could play ball, and that directions were then given to his brother to bring him out the next morning, and that after he played ball with them one day his brother was told that claimant had a job. In detailing what Fletcher had said, he used the following language:

"Q. And that time you talked to Charley Fletcher? A. Yes, sir. Q. What did he tell you? A. He told me if I was good, enough for the team I had a job as long as they had a ball team. Q. When this ball team went to practice, who told you to go ? * * * A. The superintendent always told us, came down and give order to take us early up to the park. Q. Had all the ball players in one gang? A. Yes, sir. Q. The superintendent came up and told the foreman to take you to practice? A. Yes, sir. Q. Where did you go to practice? A. At that time we didn't have much of a park— had one out in the field, close to the office, and later on we got a park at the Fair Grounds. Q. At the time you got hurt where were you practicing? A. Out about Slick's office. Q. In the oil field? A. A quarter of a mile from the office. Q. On the Slick lease? A. Yes, sir."

Claimant was cross-examined and there was little variation from his original statement, except that his associates in the ball

world and his experience in playing ball were more fully developed. It further developed that some of the foremen were ball players, and claimant says:

"A. I don't know for sure, I could get the — get the others by the right name, they just hired them all the time, part of them were not good enough for the team, they were not good enough and switched them to another gang, so they just had a team going different ways all of the time, they were the boys I knew personally, because they stayed on the team. Q. Was this gang you were assigned to comprised entirely of ball players? A. Yes, sir—had all the ball players in one gang, 12 or 14 of us—biggest part of the time had 14. Q. I believe you stated that your regular working hours from seven a. m. to five p. m.— is that correct A. Yes, sir."

He further claimed that the superintendent sometimes during the day or afternoon would come by and instruct the foreman to take them over to the field to practice, and he claimed that Chas. Fletcher was the superintendent and that he received full pay while playing ball, and he detailed the cut and make of the uniforms, and the advertisement on the back differing. Among others mentioned were the Empire Company and the Ford Company, and at page 21, we find the following:

"Q. Do you know whether or not applications were made to the head office of T. B. Slick for finances? A. Not for sure, one Sunday morning we had a lot of the superintendents tell us we were going to have a team,—good ball players—T. B. Slick had the money to back them up—T. B. Slick was going to have a ball team and a good one. Q. You know what Sunday morning that was? A. About a week before I got hurt, I think."

He was playing the "production" the evening he got hurt, and that where he got hurt was "on the Slick lease, about a quarter of a mile—not a mile from the office, * * * over half a mile from where we were working out there playing ball," and went there in a car. He detailed that he was signaled by the catcher, who was assistant coach for the team, to slip in, the language being:

"A. Well, he gave me a signal to slip in—I started to slide, I fell over and broke the bone in my ankle. Q. You slid feet first? A. Yes, sir. Q. Did you make it? A. I hit the base—I didn't stay on the base."

He was interrogated about his care and where he lived, and about his brother losing his job, and that he told the truth about

114

the accident, and that then they did not pay him any more compensation.

The brother of the claimant detailed the circumstances about getting the job, and that after claimant was hurt the witness was put in charge of a pipe-laying crew, and that a "tool pusher" wanted to leave the gang about 2 o'clock in the evening, and he let him go three or four times, but he could not play well enough. He was instructed by Fletcher to carry him on the pay roll at full time. It is apparent that the employer did not maintain a ball team and did not furnish anything for the purpose, but that the foreman did not object to the men playing ball, and an effort was made to establish by the employees that they made up the time in extra work that they took off of the regular hours, though no deduction appears to have been made by reason of playing ball. A slightly different version was put by the persons immediately in charge of the pipe line crew from what was detailed by the claimant, but it is very apparent that playing ball was looked upon by most of those concerned as a matter of great importance.

We are not able to find in the statutes any warrant for pipe line companies hiring ball players and engaging in the sport of playing ball under the Workmen's Compensation Law, so as to allow that law to regulate redress for injuries occurring while playing ball. As applied to the present case, it appears that the catcher signaled the claimant to go down from the second base to the third and to slide if necessary. Perhaps the catcher was negligent in signaling just the time it was done, or it may be that the claimant was guilty of contributory negligence in sliding as he did, which perhaps could be redressed in a trial before a court in a suit by the employee against his master for failure to perform his duties as master, and perhaps the doctrine of failure to furnish a safe place to work in might be appealed to, but as applied to the Workmen's Compensation Law, the admitted facts here do not bring it within the provisions of that law, as we view it. Briefs have been filed by one side affirming that it does not come within the provisions of the Workmen's Compensation Law, and by the other side that it does. On page 20 of the brief of the petitioners, we find the following:

"Assuming that the claimant was employed to play baseball, his injuries sustained in that employment are not compensable, because (1) they did not arise out of one of the specified hazardous employments for which compensation is provided, and (2) playing baseball is not work incident to or connected with 'construction and operation of pipe lines,' one of the specified hazardous employments."

There is a dissertation by the brief-maker as to the employments embraced within the Workmen's Compensation Law, and quotation is made from Harris v. O. N. G. Co., 91 Okla. 39, 216 P. 116, warning against the danger of amending the statute "by judicial construction upon an attenuated theory or inclusion," as well as some definitions taken from the dictionary, and a case as to a corporation employing a stevedore, and a New York case of Larson v. Paine Drug Co., 218 N. Y. 252, 112 N. E. 725, as to what is incidental, as well as some cases from this court wherein parties were hurt while acting as collectors.

The opposition brief on this point states the position as follows:

"Petitioners' second assignment of error is that the injury sustained by the claimant did not arise out of one of the specified hazardous employments for which compensation is provided, and that playing baseball is not work incident to or connected with 'construction and operation of pipe lines,' one of the specified hazardous employments."

The argument is made that the party was hired to play baseball. That appears to be true under this record, and some citations of authority are made from L. R. A. and R. C. L. and A. L. R., and especially the case of Anderson & Kerr v. State Ind. Com., 155 Okla. 137, 7 P. (2d) 902, which was a case of unpremeditated playing while on duty, and a hazardous occupation as defined by the statute is cited, and also the case of Okla.-Ark. Telephone Co. v. Fries, 128 Okla. 295, 262 P. 1062, is cited as being decisive of the case, which was a case of a clerical worker and a man who was a mechanical laborer being engaged in clerical work at the immediate time of the injury, who was shot in a fight between two of the managers, and also the cases of Motor Equipment Co. v. Stephens, 145 Okla. 156, 292 P. 63, and I. T. I. O. v. Whitten, 150 Okla. 303, 1 P. (2d) 756, and an extract from Sapulpa Refining Co. v. State Ind. Comm., 91 Okla. 53, 215 P. 933, and reference is made to Ferris v. Bonitz, 149 Okla. 129, 299 P. 473. which was the case of a janitor who performed duties as an elevator operator, but was hurt in purely janitor service, reversing the Commission.

It is not thought necessary to make comment on comment, and thereby give rise to more comment, but it is sufficient to say that it is clear in this case, and is admitted, that the party was engaged in playing baseball, which is not one of the employments that comes under the Workmen's Compensation Law. The insurance carrier assumed the risk of hazardous work as declared by the Workmen's Compensation Law, and not of playing baseball. The employer hired him to do both, according to the version that is put on it by the claimant. He was injured in the nonhazardous work. There does not seem to be any logical connection between employment to lay a pipe line, which carries with it extra hazards, and the employment to run the line between bases in a baseball game, which has not by our Legislature been classed as hazardous employment.

Of the cases cited, the nearest in declaration of applicable legal principle is the janitor and elevator employment case. decided by this court May 26, 1931, all the Justices present concurring. It is reported in 149 Okla. 129, 299 P. 473, as Ferris v. Bonitz. The syllabus, which appears to be a fair summation of the points discussed and decided, is as follows:

"An employee engaged as janitor foreman in an office building, whose duties are to run an elevator, have charge of the help, keep the sinks unstopped, and operate the vacuum cleaner, who sustains an accidental personal injury while performing janitor work, in no way connected with the operation of the elevator, is not within the provisions of section 7283, C. O. S. 1921, as amended by section 1, ch. 61, Session Laws of 1923, and may not be awarded compensation for such injury."

Aside from cited cases and the weaving into cloth of threads flotsam and jetsam taken here and there, the analogy between "work on oil pipe line construction" and a "baseball game" is not very close, though it might be said that there are some coincidences, and in this particular case there is an outstanding feature, viz., the misrepresentation made by the employer, acting through an employee, in falsely stating what claimant was doing at the time of the receipt of the injury, and the place of its happening. On this report, compensation was for a while paid by the insurance carrier, evidently believing that the injury happened as a result of stepping off the derrick floor. We are unable to see the force of the argument as to "admitted liability" or "party construction" by action

so induced. To use the language of baseball, the information of the carrier was a "foul tip."

There seems to be no evidence to support this award under the law, and it is accordingly vacated. If claimant has any right, it would have to be enforced in the courts and not before the Industrial Commission.

The Industrial Commission is ordered to dismiss this proceeding without prejudice to any rights that the claimant may have to hold his employer liable before the courts.

LESTER, C. J., and HEFNER, SWINDALL, and ANDREWS, JJ., concur. RILEY and McNEILL, JJ., concur in conclusion. CLARK, V. C. J., dissents. CULLISON, J., absent.